

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEL MONTE FRESH PRODUCE,<br>N.A., INC., | ) | No.    07 C 5902 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | The Honorable William J. Hibbler |
| | ) | |
| v. | ) | |
| | ) | |
| CHIQUITA BRANDS INTERNATIONAL | ) | |
| INC., and KIM KNNAVY, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Del Monte Fresh Produce N.A., Inc., alleges its former employee Kim Kinnavy breached

her confidentiality and non-compete agreement when she left Del Monte to work for

Chiquita Brands International. Del Monte also alleges Chiquita committed various

business torts. Kinnavy and Chiquita deny the allegations and move for summary

judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth

below, Kinnavy's motion for summary judgment is GRANTED in part and DENIED in

part. Chiquita's motion for summary judgment is GRANTED.

I.    Factual Background

For such a complex case, the facts are quite simple. Kim Kinnavy worked in the

Illinois office of Del Monte as district sales manager from 1999 until she resigned in

2007. As a sales manager, Kinnavy worked with customers who had banana supply

contracts. Del Monte gave its sales managers—including Kinnavy—laptop computers

1

and access to Del Monte's customer database. Two weeks before Kinnavy resigned, she used her laptop to e-mail herself files with the following titles: (a)Fuel surcharge: (b)Revised royal; (c)Contract renewals; (d) Pineapple update; (e)Phone list; (f) North American Customer Database 2005; (g) Fax List – Old Machine; (h) Fax List – III-6-06; and (i) CUSTMAST.xls. Kinnavy also e-mailed a copy of the "Fax List" and the "Phone List" to Mike Elsen, a broker working in Phoenix Arizona. Kinnavy denies she used the files for commercial purposes or that the files contained confidential information. After resigning, Kinnavy went to work for one of Del Monte's chief competitors: Chiquita Brands International.[1]

Upon learning of Kinnavy's new employment, Del Monte sued Kinnavy in the Circuit Court of Cook County. Next, Del Monte removed the case to this Court on the basis of diversity jurisdiction and amended its pleadings to include Chiquita as a defendant. The essence of Del Monte's complaint is that Kinnavy violated federal law, and breached her employment agreements by working for a competitor and e-mailing confidential information to a third party. Del Monte also claims Chiquita tortiously interfered with Del Monte's business contracts and made intentional misrepresentations. Kinnavy and Chiquita move for summary judgment on all claims.

## II.        Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the

---

[1] Kinnavy worked for Chiquita for approximately three months before she was terminated.

2

initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. Fed. R. Civ. P. 56(c). Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The non-moving party must produce specific facts showing there is a genuine issue of material fact, and the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Finally, all evidence and inferences must be viewed in the light most favorable to the non-moving party. *Id.* at 255.

### III. Analysis

*A. The Computer Fraud and Abuse Act does not Apply to Kinnavy*

Count III alleges Kinnavy intentionally—and without authorization—accessed Del Monte's computer system and e-mailed business-related documents to her personal e-mail account and to Mike Elson, a broker in Arizona. According to Del Monte, these actions constitute a violation of the Federal Computer Fraud and Abuse Act. By contrast, Kinnavy disputes whether her actions trigger liability under the statute.

The Computer Fraud and Abuse Act prohibits, *inter alia*, individuals from illicitly accessing secure computers and damaging the computer or the data.[23] 18 U.S.C.§1030. Although the CFAA is primarily a criminal statute, it provides a private right of action:

---

[2] Del Monte has alleged violations of multiple sections of the CFAA. A person violates §1030(a)(2) if she intentionally accesses a "computer without authorization or exceeds authorized access and thereby obtains – information from any protected computer if the conduct involved an interstate or foreign communication." A person violates §1030(a)(4) if she "knowingly and with intent to defraud, accesses a protected computer without authorization or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains something of value ..." A person violates §1030(a)(2)(c) if she intentionally accessing a "computer without authorization or exceeds authorized access and thereby obtains

3

> Any person who suffers *damage or loss* by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief …

18 U.S.C. §1030(g)(emphasis added). Thus, Del Monte must show that it suffered damage or loss in order to maintain an action under the CFAA. The CFAA provides very specific definitions of damage and loss. Section 1030(e)(8) defines "damage" as any "impairment to the integrity or availability of data, a program, a system or information." The CFAA defines "loss" as:

> Any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program system or information to its condition prior to the offense, any revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service.

Section 1030(e)(11).[4]

Kinnavy admits she accessed Del Monte's business information after her authority to view these documents expired. *See, e.g., International Airport Centers v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (holding employee no longer had authority to access company's confidential information once he breached duty of loyalty and decided to quit employer.). Kinnavy also admits she e-mailed herself and Elsen some of Del Monte's customer information. The only question is whether these actions "damaged" Del Monte or caused it to suffer a "loss" under the CFAA.

---

– information from any protected computer." A person violates §1030(a)(5)(A) if she "knowingly causes the transmission of a program, information, code or command, and as a result of such conduct intentionally causes damage without authorization to a protected computer."

[3] Congress amended several portions of the CFAA effective September 2008. The Court, however, will apply the terms of the CFAA that were in effect during the time of the complained of conduct. *See, e.g., Motorola v. Lemko Corp.*, No. 08-C5427, 2009 U.S. Dist LEXIS 10668, *9 (N.D. Ill. Feb. 11, 2009)("Congress recently amended several sections of the CFAA … the court will apply the terms of the CFAA as they existed during the course of the defendants' alleged conduct.").

[4] The plaintiff must show at lest a loss of $5,000 11U.S.C. §1030(a)(4)

4

Under the CFAA, an employee causes "damage" when she destroys company data. For example, in *Citrin*, the Seventh Circuit held a business was damaged because a former employee deleted all the files on his company-issued laptop and "loaded into the laptop a secure-erasure program, designed, by writing over the deleted files, to prevent their recovery." *Citrin*, 440, F.3d. at 419. Similar reasoning was applied by the district court in *Patrick Patterson Custom Homes v. Bach*, which found that a business was damaged because an employee "deleted files from the laptop computer and installed a shredding software to destroy files on the laptop computer and render them unrecoverable." 586 F. Supp. 2d 1026, 1030 (N.D. Ill. 2008).

By contrast, merely downloading and e-mailing confidential information is insufficient to show damages under the CFAA. In *Garelli Wong & Assocs. v. Nichols*, Garelli Wong claimed that Nichols—an ex-employee who went to work for a competitor — "compiled significant amounts of Garelli Wong's confidential and proprietary client and candidate information … and attempted to send this information to his personal e-mail account and/or copied it for his personal use." 551 F. Supp. 2d 704, 707 (N.D. Ill. 2008). Nichols argued there was no damage because his "unauthorized acts of copying and e-mailing Garelli Wong's computer files did not impair the integrity or availability of the information in the Database and did not cause any interruption of service." *Id.* at 709. The court agreed:

> Though Garelli Wong would like us to believe that recent amendments to the CFAA are intended to expand the use of the CFAA to cases where a trade secret has been misappropriated through the use of a computer, we do not believe that such conduct alone can show 'impairment to the integrity or availability of data, a program, a system or information.'

*Id.* at 710. *See, also Sam's Wines & Liquors, Inc. v. Hartig*, No. 08 C 570, 2008 U.S. Dist. LEXIS 76451, at *1-2 (N.D. Ill. Sept. 24, 2008) (finding no damage where an employee stole plaintiff's customer data from plaintiff's computer and took the information to one of plaintiff's competitors: "While not binding precedent, the Court finds that the rule of *Nichols* is persuasive.").

In *Motorola, Inc. v. Lemko Corp.*, Motorola alleged a group of its employees secretly accepted employment with one of its competitors and—while still working for Motorola—downloaded and e-mailed Motorola's confidential business information to third parties. No. 08-C5427, 2009 U.S. Dist LEXIS 10668, *3-6 (N.D. Ill. Feb. 11, 2009). Despite these transgressions, the court found Motorola was not damaged:

> The only harm Motorola has alleged is the disclosure to a competitor of its trade secrets and other confidential information. The CFAA's definition of damage does not cover such harm; rather, damage under the statute is limited to impairment of the integrity or availability of data and information. The plain language of the statutory definition refers to situations in which data is lost or impaired because it was erased or because for example a defendant smashed a hard drive with a hammer.

*Id.* at *22.

In sum: copying electronic files from a computer database—even when the ex-employee e-mails those files to a competitor—is not enough to satisfy the damage requirement of the CFAA; there must be destruction or impairment to the integrity of the underlying data. Here, Kinnavy did not erase any files from her company-issued laptop, nor did she install any destructive software that would comprise the integrity of the data. Additionally, Del Monte's own computer expert testified he had no reason to think Kinnavy disabled Del Monte's computers or its networks. (Holleb Dep. at 48) Del Monte suffered no damage under the CFAA.

A plaintiff that has not suffered any damage may still prevail on a CFAA claim by showing that it has suffered a loss. *Cf., Motorola, Inc. v. Lemko Corp,* 2009 U.S. Dist LEXIS 10668, at *16 ("a plaintiff alleging violations of sections 1030(a)(2) or (a)(4) need only allege damage or loss, not both); *Kluber Skahan & Assocs. v. Cordogan, Clark & Assoc.,* No. 08-C1529, 2009 U.S. Dist. LEXIS 14527, at *27 n. 14 (N.D. Ill. Feb. 25, 2009)("Plaintiff is correct in arguing that §1030(g) does not require damage for a CFAA claim to arise."). Under the CFAA, "loss" is defined as:

> Any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program system or information to its condition prior to the offense, any revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service.

Section 1030(e)(11).[5] Del Monte argues it suffered a loss because it paid a technology consultant to conduct a damage assessment of Kinnavy's computer. The CFAA states that a company that pays for damage assessment may satisfy the loss requirement. *See, e.g., Bach,* 586 F. Supp. 2d at 1030 (finding that a plaintiff who hired "forensic experts to attempt to restore deleted files" had adequately alleged a loss under the CFAA). In support of its assertion, Del Monte submitted the affidavit of Jon Holleb, the information technology consultant. Holleb's affidavit states Del Monte hired him to conduct a "damage assessment" of Kinnavy's computer, and he charged Del Monte approximately $5,000 for his services. (Holleb Aff. ¶¶ 3-6). Del Monte argues Holleb's fees constitute losses under the CFAA. The Court disagrees.

This is not a motion to dismiss. Therefore, the Court cannot blindly accept the allegation that Holleb conducted a "damage assessment" as true. In his deposition, Holleb testified the phrase "damage assessment" does not appear in his engagement letter

---

[5] The plaintiff must show a loss of at least $5,000 §1030(a)(5)(B)

with Del Monte. (Holleb. Dep. at 55). Additionally, Holleb testified when he signed his contract with Del Monte, he did *not* believe he would be assessing whether there was any impairment to the integrity or availability of data on Del Monte's systems or hard drives. (Holleb Dep. at 57.) It bears repeating, "damage" in the context of the CFAA means destruction of data. Here, Holleb testified he does not remember being asked to test Kinnavy's hard drive to see if it worked, and he "never heard" that the computers used by Kinnavy were inoperable. (Holleb Dep. 28). In other words, Holleb did not conduct any assessments to ascertain whether Kinnavy had "damaged" Del Monte's computers or data. The following exchanges from Holleb's deposition illustrate this point:

Q: You were not asked to examine any programs or systems or data on the network itself?

A. No.

Q: And, in fact, you were not interested in determining whether there had been any impairment to the integrity or availability of a program on any of these computers—program or programs on any of these computers; isn't that correct?

A: We never attempted to start a program that was resided on those—by program, I mean, an application. A software application. We never attempted to start anything.

(Holleb Dep. 21; 40). What Holleb was asked to do, however, was to search the computers for certain keywords related to Chiquita, and then, report back with his findings. (Holleb Dep. at 56-57). Just because Del Monte alleges it paid for a "damage assessment" does not make it so. Del Monte was not concerned about the integrity of its data or networks; indeed, there was never any evidence that either its computers or its systems were damaged. It appears Del Monte hired Holleb for assistance in its lawsuit against Kinnavy and Chiquita, not to conduct a damage assessment. While this is certainly a legitimate business concern, it does not transform the harms suffered by Del

8

Monte into "losses" under the CFAA. *See, e.g., First Mortgage Corp. v. Baser*, No. 07-C6735, 2008 U.S. Dist. LEXIS 36885, at *9 (N.D. Ill. Apr. 30, 2008)(finding that plaintiff's injury was not a "loss" under the CFAA because it was not "the result of the impairment or unavailability of data on the computer."); *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 Fed. Appx. 559, 562, 563 (2nd Cir. 2006) ("Because it is undisputed that no interruption of service occurred in this case, L&K's asserted loss of $10 million is not a cognizable loss under the CFAA.");*Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005) ("Costs not related to computer impairment or computer damages are not compensable under the CFAA.").

The Court's finding that liability under CFAA is inappropriate for an employee that e-mails business data to a third party is in harmony with the purpose of the statute: punishing individuals who destroy data. In *Citrin*, the Seventh Circuit discussed the reasoning behind the enactment of the CFAA:

> Congress was concerned with ... attacks by virus and worm writers, on the one hand, which come mainly from the outside, and attacks by disgruntled employees who decide to trash the employer's data on the way out ...

*Citrin*, 440 F.3d at 420. In a recent case, Judge Zagel commented that the "underlying concern of the Act [is] damage to data" and that "the statute was not meant to cover the disloyal employee who walks off with confidential information." *Kluber Skahan & Assocs.*, No. 08-1529, 2009 U.S. Dist. LEXIS 14527, at *20 quoting *Am. Family Mut. Ins. Co. v. Rickman*, 554 F. Supp. 2d 766, 771 (N.D. Ohio 2008) (dismissing CFAA claim against employee who misappropriated employer's confidential information). The Court agrees with these interpretations of the CFAA. Kinnavy is not a hacker. She is not a virus or a worm writer. She did not "trash" Del Monte's "data on the way out." She is

9

a sales manager who apparently believed the customers with whom she spent years building relationships were her clients as opposed to Del Monte's. The CFAA should not be used to prosecute employees who are merely disloyal. The Court grants Kinnavy's motion for summary judgment as to Count III.

B.    *Del Monte Fresh Produce, N.A., Inc. is not a Signatory to the Contract at Issue in Count IV*

In 1999, Kinnavy signed a document titled "Employee Agreement Relating to Assignment of Inventions and Non-Disclosure of Confidential Information."[6] The document prohibited, *inter alia*, employees from disclosing confidential information relating to sales, marketing or advertising. Del Monte claims Kinnavy violated this agreement by e-mailing Del Monte's business information to herself and a third party. In Count IV of its Amended Complaint, Del Monte seeks to recover damages stemming from the alleged breach of the 1999 agreement.

The Court begins its inquiry with the language of the agreement. The contract runs between the "undersigned" (Kim Kinnavy) and "Del Monte Fresh Produce Company or its subsidiaries or its successors (hereinafter called the "Company"))." (Am. Compl. Ex. A) The contract also states, "The employee will not disclose ... any Company [*i.e.*, Del Monte Fresh Produce Company] proprietary information." (*Id.*) Thus, Kinnavy has a contractual obligation to *Del Monte Fresh Produce Company* and its subsidiaries or successors. The plaintiff in this case, however, is neither the Del Monte Fresh Produce Company nor one of its subsidiaries or successors. Here, the plaintiff seeking to enforce the contract is an entirely different Del Monte entity: *Del Monte Fresh Produce, N.A., Inc.*

---

[6] Attached as Exhibit A to the plaintiff's amended complaint.

It may seem like the Court is splitting hairs by distinguishing between The Del Monte Fresh Produce Company and Del Monte Fresh Produce, N.A., but the Court has no choice: the companies are *separate* and *distinct* corporations. The Del Monte Fresh Produce Company is incorporated in Delaware; Del Monte Fresh Produce, N.A., is incorporated in Florida. The two entities do not have a parent-subsidiary relationship. The plaintiff in this case, Del Monte Fresh Produce, N.A., Inc., admitted it is a wholly owned subsidiary of yet a third entity: Fresh Del Monte Produce Inc. (incorporated in the Cayman Islands) (Pl. 56.1(b)(3)(C) St. ¶ 3.) Emmanuel Lazopoulos—a senior Vice President of Del Monte Fresh Produce, N.A.—stated, "It is my understanding that both Del Monte Fresh Produce N.A., Inc., and Del Monte Fresh Produce Company are subsidiaries of Fresh Del Monte Produce, Inc."[7] (Lazopoulos Dep. at 39, attached as Ex. 5 to Kinnavy's Resp. Br.). Thus, it appears that Del Monte Fresh Produce N.A., Inc., and Del Monte Fresh Produce Company are sibling corporations.

According to the Seventh Circuit, "a corporation is deemed a distinct legal entity, separate from other corporations with which it may be affiliated." *Baxter Healthcare Corp., v. O.R. Concepts, Inc.*, 69 F.3d 785, 788 (7th Cir. 1995) quoting *Flynn v. Allis Chalmers Corp.*, 262 Ill. App. 3d Ct. 1994, 492 N.E. 2d 551, 558, 97 Ill. Dec. 115 (Ill. App. Ct. 1986). The Court's finding that Del Monte Fresh Produce, N.A., Inc., and Del

---

[7] Emmanuel Lazopoulos filed an affidavit on October 22, 2008, claiming Del Monte Fresh Produce N.A. was a subsidy of Del Monte Fresh Produce Company. This statement is contradicted by Del Monte's response to Kinnavy's statement of facts in which Del Monte admitted "Fresh Del Monte Produce N.A. is a wholly owned subsidiary of Fresh Del Monte Produce Inc." (Pl. 56.1(b)(3)(C) St. ¶ 3.) Lazopoulos also stated in his deposition, "It is my understanding that both Del Monte Fresh Produce N.A., Inc., and Del Monte Fresh Produce Company are subsidiaries of Fresh Del Monte Produce, Inc." Now, because of Lazopoulos' affidavit, Del Monte claims the corporate structure is in dispute, and there must be a trial. Del Monte needs to tread carefully on this issue. The Court will not tolerate attempts to manufacture issues of fact by filing contradictory statements. If the Court allowed parties to create issues of fact by contradicting themselves, no case would ever be decided via summary judgment. The Court will accept Lazopoulos' most recent statements on the matter, and Del Monte's *own admissions* to Kinnavy's Rule 56 statements and move on.

Monte Fresh Produce Company are distinct legal entities is supported by the conduct of the corporations. For example, in a recent case filed in the Northern District of Illinois, the named plaintiffs were Del Monte Fresh Produce, N.A., Inc., *and* Del Monte Fresh Produce Company. *Del Monte Fresh Produce, N.A., Inc., and Del Monte Fresh Produce Company v. Transportation Insurance Company*, No. 06-1658, 2006 U.S. Dist. LEXIS 58986 (N.D. Ill. Aug. 8, 2006). If these two corporations were really the same entity, listing them both would be unnecessary and redundant. Moreover, two law firms filed appearances on behalf of Del Monte Fresh Produce, N.A., and *not* on behalf of Del Monte Fresh Produce Company. A reasonable explanation is that Del Monte Fresh Produce Company and Del Monte Fresh Produce, N.A., are separate legal entities with separate legal issues.

For whatever reason, the Del Monte parent company chose to conduct its business through various subsidiaries, spin-offs and affiliates. The Court is bound to respect the corporate form. As a general rule, a plaintiff "must assert his *own* legal rights and cannot rest his claim to relief the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975)(emphasis added). Indeed, a "corporation does not have independent standing to sue for injuries done to a sister or subsidiary corporation, despite the fact that their business are intertwined and the success of one is dependent on that of the other." 1 Fletcher Cyclopedia of the Law of Private Corporations § 36 (rev. ed. 2006); *Hudson Optical Corp. v. Cabot Safety Corp.*, No. 97-9046, 1998 U.S. App. LEXIS 22391, at *8 (2nd Cir. 1998) ("Hudson claims that the district court erred in precluding it from presenting evidence of breach of contract damages sustained by Fashionline, its 91%-owned subsidiary. However, Fashionline is a

separate corporation and Hudson had no standing to assert Fashionline's legal rights.").

Because Del Monte Fresh Produce, N.A., does not appear in the contract, and Del Monte

Fresh Produce, N.A., is not the same entity as the Del Monte Fresh Produce Company,

the Court must conclude the plaintiff has no standing to enforce the contract. The Court

grants Kinnavy's motion for summary judgment as to Count IV.

C.    *The IT Operations Contract is Enforceable*

Count V of Del Monte's Amended Complaint alleges Kinnavy violated the

policies contained in Del Monte's IT Operations Management Guide. (Am. Compl. Ex.

B)(the "IT Operations contract")  The IT Operations contract states employees cannot

disclose "internal information" to "unauthorized persons" and includes the following

language:

> I understand that non-compliance will be cause for disciplinary action up to and
> including system privilege revocation, dismissal from the Company, and perhaps
> criminal or civil penalties.

(*Id.*) Kinnavy signed the document on April 20, 2004, and agreed to abide by the

policies. Del Monte alleges Kinnavy disclosed confidential information to a third party

in violation of this agreement. In response, Kinnavy argues: "The Operations Guide on

its face does not impose binding obligations; all it states is that 'non-compliance will be

cause for ... *perhaps* criminal and or civil penalties." (Kinnavy Mot. for Summary

Judgment at 11) (emphasis in original).[8]  Kinnavy's argument completely ignores the

---

[8] Kinnavy also argues the contract is void for same reasons the contract was void in Count IV. Specifically,
Kinnavy argues the contract only states "The Company" therefore the Court cannot be certain which Del
Monte entity has standing to enforce the contract. This argument is not persuasive. The contract at issue in
Count IV *explicitly* stated it was between Kinnavy and an entity other than her employer. Although the
contract in Count V only states it is between Kinnavy and "the Company," the Court's primary goal in
construing contracts is to "determine and give effect to the intentions of the parties at the time they entered
into the contract." *Tranzact Techs., Ltd. v. Evergreen Ptnrs., Ltd.*, 366 F.3d 542, 546 (7th Cir. 2004)
quoting *Ancraft Prods. Co. v. Universal Oil Prods. Co.*, 100 Ill. App. 3d 694, 427 N.E.2d 585, 588, 56 Ill.
Dec. 390 (Ill. App. Ct. 1981). In the absence of explicit language to the contrary—*i.e.*, the language in the

13

other language of the contract: "As a condition of continued employment at the Company, I agree to abide by the policies and other requirements found in that manual... I understand that non-compliance *will be* cause for disciplinary action..." (*Id.*) (emphasis added) The contract clearly states—in mandatory language—that Kinnavy had to abide by the confidentiality policy in order to continue her employment. This language of the policy, signed by Kinnavy, created a binding contract. Whether Del Monte had the discretion to waive remedies beyond firing Kinnavy is irrelevant. The Court denies Kinnavy motion for summary judgment as to Count V.

D.    *The Non-Compete Agreement is Unenforceable*

Counts VI and VII of Del Monte's Amended Complaint alleges Kinnavy breached Del Monte's "Policy of Trade Secret and Non-Competition." (Am. Compl. Ex. C) ("Non-Compete Agreement") The Non-Compete agreement states:

> For a period of 12 months from the date of Employee's separation from the employment with the Company, the Employee shall not be employed by ... or connected in any manner with, any business which represents, distributes, sells or brokers fresh vegetables, fresh fruit, and other fresh produce products: (a) to any person who or entity which is a customer of the Company on the date of termination of the Employee's employment ... or during the 12 month period prior thereto... or (b) on behalf of or supplied by any person who or entity which is a supplier of the Company at the date of termination ...

> This policy shall in all respects be subject to, and governed by, the laws of the state of Florida, without regard to its conflict of laws principles.

(Am. Compl. Ex. C).[9]

___

Count IV contract—the Court finds that the contract runs between Kinnavy and Del Monte, Fresh Produce, N.A. In any event, whether Kinnavy truly intended *not* to enter an agreement with her employer, is an issue of fact precluding summary judgment.

[9] Throughout this litigation, Del Monte has argued that the four pages compromising Exhibit C are a free-standing contract. Kinnavy acknowledges that she signed the agreement, but claims: (1) Del Monte attached a different version of the agreement to its prior state court complaint; and (2) The contract in Exhibit C was really part of an employee handbook or manual. *See, e.g.*, Del Monte's Resp. Br. at 2. Both sides have put forth plausible arguments regarding whether the contract was free standing, or part of a

Before the Court can analyze whether this restrictive covenant is enforceable, the Court must determine whether to apply Florida or Illinois law. A federal court sitting in diversity must apply the conflict of laws rules of its forum state. *Utz v. Nationwide Mut. Ins.* Co., 619 F.2d 7, 9 at n.1 (7th Cir. 1980). Illinois has adopted the Restatement (Second) of Conflict of Laws. *Gramercy Mills, Inc. v. Wolens,* 63 F.3d 569, 572 (7th Cir. 1995). Section 187 of the Restatement governs situations like the present where the parties have included an explicit choice of law provision in their contract. Under that section, the parties' choice of law provision will control unless: (A) the chosen state has no substantial relationship to the parties or the transaction, and there is no reasonable basis for the parties choice, or (B) application of the law of the chosen state would be contrary to a fundamental policy of a state, which has a materially greater interest than the chosen state. Restatement (Second) §187 (a)(b) (1971).

Illinois law governs this dispute. To be sure, Del Monte has a reasonable basis for including Florida law in the contract: Del Monte—at least this particular entity—is incorporated in Florida. Nevertheless, (1) Del Monte chose to sue Kinnavy in the state court of Illinois; (2) Kinnavy is an Illinois resident; (3) Kinnavy worked in Del Monte's Illinois office; (4) Kinnavy signed the contract in Illinois and (4) the laws of Florida regarding restrictive covenants are contrary to the fundamental policy of the laws of Illinois. For example, in *Brown & Brown, Inc. v. Mudron*, the appellate court applied Illinois law to a restrictive covenant even though the employment contract contained a Florida choice of law provision:

handbook. At the summary judgment stage, the Court must interpret the facts in the light most favorable to the non-movant. Here, that means that the Court will assume Exhibit C was a stand-alone contract, signed by Kinnavy. .

15

[I]t is clear that Illinois law will control the outcome of this dispute. Under Illinois law, in determining whether a restrictive covenant is reasonable, a court must consider the hardship the covenant imposes upon the individual employee. Florida law, however, specifically prohibits considering that factor. Fla. Stat. Ann. §542.335(1)(g)(1) (West 2007)

Thus, as a matter of fundamental public policy, Illinois has chosen to provide its workers greater protection from the negative effects of restrictive covenants. Florida law, which specifically prohibits considering the hardship a restrictive covenant imposes upon an individual employee, is contrary to Illinois's fundamental public policy.

*Brown & Brown, Inc. v. Mudron*, 379 Ill. App. 3d 724, 727-28, 887 N.E.2d. 437, 320 Ill.

Dec. 293 (Ill. App. Ct. 2008). The Court finds this reasoning persuasive and will apply

the laws of its home-state. [10]

As a general rule, Illinois courts are reluctant to enforce restrictive covenants.

*See, e.g., Francorp, Inc. v. Siebert*, 126 F. Supp. 2d 543, 546 (N.D. Ill. 2000)

(invalidating an employee's non-compete agreement and noting, "Illinois courts have

long been hostile toward restrictive covenants as restraints on trade and contrary to sound

public policy."); *Roberge v. Qualitek Int'l, Inc.*, 2002 U.S. Dist. LEXIS 1217, at \*12

(N.D. Ill. Jan. 28, 2002) (invalidating an employee's non-compete agreement and noting,

"In Illinois, restrictive covenants are disfavored in the law and closely scrutinized

because they are repugnant to the public policy encouraging an open and competitive

marketplace."). Post-employment restrictive covenants "operate as partial restrictions on

trade" and must be carefully scrutinized by the reviewing court. *Cambridge Eng'g, Inc.*

*v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 447, 879 N.E.2d 512, 316 Ill. Dec.

---

[10] Fla. Stat. Ann. §542.335(1)(g)(1) states: "In determining the enforceability of a restrictive covenant, a court: *Shall not consider any individualized economic or other hardship* that might be caused to the person against whom enforcement is sought." (emphasis added) By contrast, in Illinois: "A restrictive covenant's *reasonableness is measured by its hardship to the employee ...*" *Lawrence & Allen, Inc. v. Cambridge Human Resource Group,* Inc., 292 Ill. App. 3d 131, 138, 685 N.E.2d 434, 441, 226 Ill. Dec. 331 (1997) (emphasis added).

445 (Ill. App. Ct. 2007). Nevertheless, a restrictive covenant may be enforceable if its terms are "reasonable and necessary to protect a legitimate business interest of the employer." *Id.* quoting *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 138, 685 N.E.2d 434, 226 Ill. Dec. 331 (1997). A "restrictive covenant's reasonableness is measured by its hardship to the employee, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions." *Cambridge Eng'g*, 378 Ill. App. 3d at 447.

The Non-Compete agreement signed by Kinnavy is too broad and far-reaching to be enforceable. First, the Non-Compete contains no geographic restrictions. Thus, even if Kinnavy were to move to Lagos, Nigeria, she would still be bound by the restrictive covenant; this is unreasonable. In response, Del Monte argues extra restrictions are necessary because it is a multi-national firm that competes globally. This argument misses the mark. For example, in *Roberge v. Qualitek Int'l, Inc.*, the court analyzed a similar contention by an employer seeking to enforce a non-compete:

> Qualitek asserts that because it has customers globally and has competitors throughout the United States ... inserting an arbitrary boundary such as prohibiting Roberge from competing with Qualitek in the State of Illinois ... would not protect Qualitek's legitimate interests. While this is perhaps the most logical argument [Qualitek] could make ... *it is a position that has been rejected countless times by both state and federal courts in Illinois* [citing cases] Given this compelling authority we reject Qualitek's argument ...

2002 U.S. Dist. LEXIS 1217, at *16-17 (emphasis added); *see, also Hay Group, Inc. v. Bassick*, No. 02 C 8194, 2005 U.S. Dist. LEXIS 22095, at *11 (N.D. Ill. Sept. 29, 2005)(finding non-compete agreement lacking geographic boundaries unenforceable: "This non-compete effectively precludes Bassick from engaging in his occupation ... in any part of the world ... For this reason, the Bassick Noncompete is an unreasonable

restraint on trade and is invalid."); *George S. May Int'l Co. v. International Profit Assocs.*, 256 Ill. App. 3d 779, 628 N.E. 2d 647, 655 (Ill. App. Ct. 1993)(declining to enforce restrictive covenant which prevented employees from working in states in which they never worked for their employer.).

The Non-Compete agreement also contains blanket prohibitions on the *types* of employment Kinnavy can pursue. In Illinois, "an individual has a fundamental right to use his general knowledge and skills to purse the occupation for which he is best suited." *International Profit Assocs.*, 628 N.E. 2d 647, at 653. But here, the Non-Compete prohibits Kinnavy from "being connected in *any manner* with" an entity that bought fruit, vegetables, or other produce from Del Monte. Under these terms, Kinnavy could not work as a cashier at a Piggly-Wiggly that bought produce from Del Monte. These restrictions are simply too broad to be enforceable. Judge Coar had this to say when faced with a similar restrictive covenant:

> As written, the covenant restricts Chase from working for any company, in any manner, in any business 'leasing, renting selling, and using all sorts of transportation' or any similarly situation business dealing in related products. The universe of companies falling within the broad sweep of these loosely defined terms is simply too large to be considered reasonable.

*Trailer Leasing Co. v. Assocs Commercial Corp.*, 1996 U.S. Dist. LEXIS 9654, , at *10 (N.D. Ill. July 10, 1996). Similarly, in *Telxon Corp. v. Hoffman*, the court refused to enforce a non-compete agreement where the scope of the prohibited activities so broad that "the agreement would preclude Hoffman from working as a competitor's janitor." 720 F. Supp. 657, 665 (N.D. Ill. 1989). Because agreements "which restrict the signor's ability to work for a competitor without regard to capacity have repeatedly been declared contrary to law" the Court finds Del Monte's Non-Compete agreement is unenforceable.

*Id.* citing., *North American Paper Co. v. Unterberger*, 172 Ill. App. 3d 410, 413, 526 N.E.2d 621, 623, 122 Ill. Dec. 362, 364 (Ill. App. Ct. 1988) (finding restrictive covenant unenforceable because, "Unterberger is prohibited from associating with any competitor in any capacity whatsoever, even if Unterberger's job were merely menial and he had absolutely nothing to do with sales or purchasing.").

Finally, Del Monte asks the Court—in the event the Non-Compete is found to be invalid—to re-write the contract so it is in compliance with Illinois law. The Court declines Del Monte's invitation. The Non-Compete agreement is simply too broad and far-reaching to be salvageable. *See, e.g., Trailer Leasing Co.*, 1996 U.S. Dist. LEXIS 9654, at *12 ("While this court has the option of blue-penciling the covenant, it declines to do so since substantial modification/deletions to the covenant would be required."); *Bassick*, 2005 U.S. Dist. LEXIS 22095, at *11 ("Where as here, the restraint is patently 'unfair because of its over breadth,' courts will refuse to modify the agreement, even in the presence of a severability clause."). Kinnavy's motion for summary judgment as to Counts VI is granted.

E.      *The Court Declines to Sever the Invalid Portion of the Contract*

The Court finds the restrictive covenant contained in the "Policy of Trade Secret and Non-Competition" is invalid as a matter of law. Therefore, the Court must decide whether the valid portions of the contract can be severed from the document.[11] In general, "courts which will enforce a contract with a portion severed generally do so

---

[11] The contract contains a severability clause. The existence of the clause, however, does not end the Court's inquiry. *See, e.g., Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 571 N.E.2d 1085, 1100, 157 Ill. Dec. 66 (Ill. App. Ct. 1991) (refusing to sever an unlawful provision despite presence of severability clause); *Thomas & Betts Corp. v. Panduit Corp.*, No. 93-4017, 1999 U.S. Dist. LEXIS 6298, at *13-14 (N.D. Ill. Apr. 8, 1999)("Although the presence of a severability clause within the agreement strengthens the case for modification, it is not determinative.").

when the severed portion does not go to the contract's essence." *People ex rel. Foreman v. Vill. of Round Lake Park*, 171 Ill. App. 3d 443, 525 N.E.2d 868, 875, 121 Ill. Dec. 561 (Ill. App. Ct. 1988) (finding contract was not severable because the unenforceable clause was an "essential feature" of the agreement."). Here, the non-competition clause was an essential feature of the contract at issue. The plain language of the contract states:

> ***each of the above provisions is essential*** to the Company and the Company would not furnish the Employee the consideration set forth in this Policy absent the Employee's agreement to abide by and be bound by each of the above provisions.

(Am. Compl. Ex. C at Sec. 4(b)). This language alone dooms Del Monte's severability argument. *See, e.g., Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 571 N.E.2d 1085, 1100, 157 Ill. Dec. 66 (Ill. App. Ct. 1991) (refusing to sever the unlawful clause because the language of the agreement specified provision as "essential" to the rest of the contract); *Tranzact Techs., Ltd. v. Evergreen Ptnrs., Ltd.*, 366 F.3d 542, 546 n.3 (declining to sever where an essential term was at issue: "The advisors also contend that a court cannot sever this contract, finding that the provision for the $40,000 retainer is enforceable, but the provision for the investment banking fee is not. We agree.").

It is clear Del Monte intended this contract to be an all or nothing, take it or leave it proposition. In other words, the contract is not divisible. *See, e.g., Fidelity & Deposit Co. of Md. v. Rotec Indus.*, 2004 U.S. Dist. LEXIS 2075, at * (N.D. Ill., Feb. 9, 2004) ("contract is not divisible if the parties assented to all the promises as a *single whole* and if striking any promise or set of promises would destroy the basis of the bargain.") (emphasis added); *Bjork v. Draper*, 381 Ill. App. 3d 528, 319 Ill. Dec. 800, 886 N.E.2d 563, 567-577 (Ill. App. Ct. 2008) ("a contract is not divisible where the parties assented to all the promises as *single whole* so that there would have been no bargain

whatsoever if any promise or set of promises were struck out.") (emphasis added).
Again, the language of the contract is instructive: "The Company would not furnish the
Employee the consideration set forth in this Policy absent the Employee's agreement to
abide by and be bound by **each of the above provisions**." (Am. Compl. Ex. C at Sec.
4(b))(emphasis added). The Court will not sever the Non-Compete clause from the rest
of the contract. Accordingly, the "Policy of Trade Secret and Non-Competition" is
invalid and unenforceable. The Court grants Kinnavy's motion for summary judgment as
to Count VII.

F.      *Del Monte's Illinois Trade Secret Act Claim is Deficient*

        Del Monte argues Kinnavy misappropriated certain confidential Del Monte data,
and in doing so, she violated the Illinois Trade Secret Act. Specifically, Del Monte
contends Kinnavy misappropriated: "prices, customer requirements, customer names, and
contact information." (Rick Cooper Aff. ¶ 10) In response, Kinnavy contends the type of
information she allegedly misappropriated is not protected under the ITSA. The Court
agrees.

        Under the Illinois Trade Secrets Act, a plaintiff may recover for damages incurred
as a result of the misappropriation of a trade secret. 765 ILCS 1065/4 In order "to state a
claim for trade secret misappropriation under the ITSA, a plaintiff must establish that it
had: (1) a trade secret, (2) that the defendant misappropriated and (3) used for business
purposes." *Charles Schwab & Co. v. Carter*, No. 04-7071, 2005 U.S. Dist. LEXIS
21348, *11 n.6 (N.D. Ill. Sept. 27, 2005). At issue here is whether Del Monte satisfied
the first element. The ITSA defines "trade secret" as:

        information, including but not limited to, technical or non-technical data, a
        formula, pattern, compilation, program, device, method, technique, drawing,

process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2 Del Monte argues its price information qualifies as a trade secret. But, the "Illinois appellate courts which have addressed the issue have consistently held that price information which is disclosed by a business to any of its customers … does not constitute trade secret information protected by the Act." *Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 437-438 (N.D. Ill. 1994); *Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill. App. 3d 948, 547 N.E.2d 675, 678 (Ill. App. Ct. 1989) (holding that pricing information given to a customer that the customer is at liberty to divulge is not a trade secret.). For example, in *Trailer Leasing,* the court declined to find that pricing information was a trade secret:

It is also unclear as to why general rate information constitutes a trade secret. By all accounts, this is a highly competitive business, and it is unlikely that rate information is ever secret, and if so, that it remains secret for very long. If competitor "A" gives a customer an advantageous rate, it will not be long before the customer shops that rate around and tries to get competitor "B" to go even lower; that is the nature of a competitive market.

*Trailer Leasing Co. v. Associates Commer. Corp.*, 1996 U.S. Dist. LEXIS 11366, at *3 (N.D. Ill. Aug. 8 1996). There is no indication Del Monte's customers were prohibited from divulging the prices they paid for bananas. There is no indication Kinnavy misappropriated a pricing formula. As such, the Court finds that price information alone cannot constitute a trade secret.

22

Del Monte also asserts the identity of its customers is entitled to protection under the ITSA. This is incorrect. Rick Cooper—Vice President of Sales and Kinnavy's supervisor—gave the following testimony during his deposition:

Q: Are you contending that Chiquita does not know who your customers are?
A: No. No, I'm not

Q: Do you know who Chiquita's customers are?
A: Yes, we do.

Q: Is there anything confidential about that?
A: No.

(Cooper Dep. at 97-98). To be sure, Del Monte and Chiquita are fierce competitors. But, there seems to be little doubt about which customers are buying bananas from which company. Indeed, all one needs to do is go to the grocery store and look at the sticker on the bananas to see whether Del Monte or Chiquita is supplying the fruit. There is no protectable interest where a business' customers are known throughout the industry. For example, one of the clients Del Monte claims it lost because of Kinnavy—The Horton Fruit Company—prominently displays on its website that it is "a licensed Dole re-packer." http://www.hortonfruit.com/fruits.htm (last accessed March 15, 2009). During Cooper's deposition, he admitted there would be nothing confidential or improper about someone walking into a grocery store and asking who supplied their bananas. (Cooper Dep. at 100) The ITSA requires the protected information to be "sufficiently secret to derive economic value." 765 ILCS 1065/2. Here, the identity of customers buying fruit from Del Monte was not sufficiently secret to warrant protection under the ITSA. *See, e.g., A.J. Dralle, Inc. v. Air Technologies*, 255 Ill. App. 3d 982; 627 N.E.2d 690, 697 (Ill. App. Ct. 1994) (identity of customers is not a trade secret because, "Dralle's customers

were known to others in the trade and could be easily ascertained by reference to telephone directories and trade journals.").

Customer contact information that takes little effort to compile is not protectable under the ITSA. Cooper acknowledged Del Monte and Chiquita are well aware of each other's customers. Thus, an individual would only need to look in the yellow pages to obtain the contact information of Del Monte customers. During his deposition Cooper was asked why the "phone list" Kinnavy e-mailed to Mike Elsen would be valuable to a competitor, he replied that it would "save somebody the time of looking Albertson's Denver location up in the phonebook." (Cooper Dep. at 102) A list of grocery stores' phone numbers is not "sufficiently secret" to confer trade secret status on Del Monte's contact list. *See, e.g., Carbonic Fire Extinguishers*, 190 Ill. App. 3d 948 at 953 (customer contact list is not a trade secret where "names, addresses, and telephone numbers of the various customers were readily obtainable from the yellow pages of the telephone directory."); *Delta Med. Sys. v. Mid-America Med. Sys.*, 331 Ill. App. 3d 777, 772 N.E.2d 768, 781(medical supply company's customer contact list was not a trade secret where the names and contact information of the 72 "hospitals and medical clinics, could be derived by merely looking in the yellow pages."); *Hamer Holding Group v. Elmore*, 202 Ill. App. 3d at 1001, 1011, 560 N.E.2d at 912, 919 (customer contact list not a trade secret because it could be easily duplicated by reviewing lists of non-profits from Secretary of State's office, distilling it by geographic region, and updating contacts and telephone numbers).

Finally, Del Monte contends information about its customers' needs and requirements is entitled to protection as a trade secret. The Seventh Circuit addressed a

24

similar situation in *Curtis 1000, v. Suess*, where a stationary company sued an ex-employee who left to work for a competitor. 24 F.3d 941, 948 (7th Cir. 1994). The Curtis 1000 company claimed the knowledge of its customers' requirements was entitled to trade secret protection. The court began by noting that an employee can gain valuable insight into the behavior of long-term customers: "Customers often conceal their real needs, preferences, and above all, reservation prices in order to induce better terms from sellers. Suess presumably had sniffed out those true needs, preferences, and reservation prices." *Id.* The operative question, however, is whether the employee is selling a service or whether the employee is selling goods where there is no qualitative differentiation across the marketplace, in other words, a mere commodity:

> Illinois cases distinguish between sellers of services, especially professional services such as accounting and consulting, and sellers of ordinary goods. In the former class, where the quality of the seller's service is difficult to determine by simple inspection, customers come to repose trust in a particular seller, and that trust is a valuable business asset, created by years of careful management, that the employee is not allowed to take away with him.

> In the latter class, involving the sale of goods, the element of trust is attenuated, particularly where as in this case the good is a simple and common one sold under competitive conditions. In these cases Illinois law does not permit the seller to claim a protectable interest in his relations with his customers ... For here current price and quality, rather than a past investment in meeting customers' needs, are the decisive factors in the continued success of the firm, and they of course are not appropriated by the departing employee.

*Curtis 1000 v. Suess*, 24 F.3d 941, 948 (7th Cir. 1994).

Kinnavy handled banana supply contracts for Del Monte. Bananas are simple, non-unique goods. The Court concludes Kinnavy and Del Monte were selling a commodity, rather than providing a service. In other words, the "decisive factors" in customers choosing Del Monte are pricing and quality. These are things that cannot be appropriated by Kinnavy. For example, Sean Walsh—the director of produce for Spartan

Grocery Stores, Inc.—testified Spartan switched its contract from Del Monte to Chiquita in large part because Chiquita's bananas were cheaper. (Walsh Aff. ¶ 4) This would make sense given that Spartan was buying a commodity. Simply put, if Del Monte provides delicious bananas to its customers at prices below Chiquita its business will succeed. The record does not support Del Monte's claim that knowledge of its customers' requirements is a trade secret. The Court grants Kinnavy's motion for summary judgment as to Count VIII.

G.    *Del Monte's Breach of Fiduciary Duty Claim is not Preempted*

Del Monte alleges Kinnavy violated her fiduciary duty by disclosing Del Monte's business-related information to Elsen. In response, Kinnavy argues the breach of fiduciary duty claim is preempted by the Illinois Trade Secret Act. The Court disagrees.

The Illinois Trade Secrets Act preempts common law claims based on misappropriation of trade secrets. 765 ILCS 1065/8(a) ("this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of trade secrets"); *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) (The ITSA "abolishes claims other than those based on contract arising from misappropriated trade secrets."). But, the language of the ITSA makes clear that it allows plaintiffs to press forward with common law claims that are not premised on the theft of a trade secret. 765 ILCS 1065/8(b) ("This Act does not affect: (1) contractual remedies, whether or not based upon misappropriation of a trade secret . . . . [or] (2) other civil remedies that are not based upon misappropriation of a trade secret.").

First, a fiduciary duty claim is not pre-empted by the ITSA. *RTC Indus. v. Haddon*, No. 06-5734, 2007 U.S. Dist. LEXIS 67008, *12 (N.D. Ill. Sept. 10, 2007)("RTC alleges that Haddon, while still employed by RTC, provided information to DCI in an attempt to curry favor with his future employer...Applying *Hecny*, RTC's fiduciary-duty claim is not preempted."). Next, Kinnavy claims if the Court eliminates the ITSA claims, it must also abolish the fiduciary duty claim. This is not so. *Combined Metals of Chicago Ltd. P'ship v. Airtek, Inc.*, 985 F. Supp. 827, 830 (N.D. Ill. 1997) (denying motion to dismiss because if the items at issue "fail to qualify as a trade secret, how could the breach of fiduciary duty count be preempted under the ITSA? Again, the ITSA preempts only counts premised on the misappropriation of a trade secret. Thus, if the [items at issue are] not a trade secret or secrets, the ITSA preemption provision is inapplicable."). In a case similar to the present dispute, the court found:

> The Complaint further alleges that Carter e-mailed confidential information to Acorn ... and that Carter copied and removed confidential information from Schwab's offices. Taken together, it is reasonable to infer that within the downloaded files, the e-mailed information, and other information removed from Schwab's office, Carter acquired proprietary and confidential information that could give rise to common law liability, *even if that information does not constitute a full-blown trade secret*

*Charles Schwab & Co.*, 2005 U.S. Dist. LEXIS 21348, at *14 (internal citations omitted) The Court finds this reasoning to be persuasive. Del Monte's breach of fiduciary duty claim is not preempted, and survives summary judgment even though the allegedly misappropriated information is not a trade secret. The Court denies Kinnavy's motion for summary judgment as to Count X.

H.    *Material Factual Disputes Preclude Summary Judgment on Del Monte's Conversion Claim*

Count IX of the Amended Complaint alleges Kinnavy took documents containing Del Monte's proprietary information and converted these documents to her own use. In response, Kinnavy argues (1) Del Monte was not deprived of the use of any information contained in the documents; and (2) there can be no conversion because what she did—e-mail Del Monte's data to herself and to a third party—implicated *intangible* goods.

To prevail on a conversion claim under Illinois law, "a plaintiff must establish: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession of the property was made; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Hewitt Assoc. v. Zebra*, No. 96-2428, 1996 U.S. Dist. LEXIS 18206, at *18 (N.D. Ill. Nov. 25, 1996) citing *Western States Ins. Co. v. Louis E. Olivero & Associates*, 218 Ill. Dec. 836, 670 N.E.2d 333, 335 (Ill.App. 1996). Kinnavy 's brief in support of summary judgment states, "it is undisputed that Del Monte N.A. did *not allege* that Kinnavy asserted dominion and control over business documents." (Kinnavy Br. at 19)(emphasis added). Del Monte, however, did allege that Kinnavy took physical files from its offices in addition to electronic information: "In taking *documents* and information ..." (Am. Compl. ¶ 138)(emphasis added) Neither side has adequately addressed this dispute. Kinnavy's affidavit makes no mention of whether she actually took files from Del Monte's offices. Kinnavy moved for summary judgment, so it is her burden to show there is no material factual dispute. There are open factual questions that preclude summary judgment. The Court denies Kinnavy's motion for summary judgment as to Count IX.

The Court is finished addressing the claims against Kinnavy, and now turns to Del Monte's allegations against Chiquita Brands International.[12]

I.    *Del Monte's Tortious Interference Claim is Deficient*

Del Monte alleges it had a business relationship with Kinnavy and that Chiquita— with full knowledge of Kinnavy's contractual obligations to Del Monte—induced Kinnavy to breach her confidentiality agreement. (Am. Compl. ¶ 45-48) Accordingly, Del Monte asserts a claim of tortuous interference with a contract against Chiquita.

To establish a prima facie showing of tortuous interference with a contract, the plaintiff must first prove: "(1) the existence of a valid and enforceable contract between the plaintiff and another party; (2) that the defendant was aware of the contractual relationship; (3) an intentional and unjustified inducement of a breach of the contract by the defendant; (4) the subsequent breach of the contract by the other party, caused by the defendant's inducement; and (5) damages." *Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir. 1994). Kinnavy's Non-Compete agreement and the Employee Agreement Relating to Assignment of Inventions and Non-Disclosure of Confidential Information are unenforceable. Therefore, these contracts cannot support the "valid and enforceable contract" requirement of a tortuous interference claim. The IT Operations Contract, however, is enforceable and satisfies the "valid contract" requirement. But, the Court's inquiry is not finished.

Chiquita argues that even if the IT Operations contract is valid, it was unaware of the contract's existence, and therefore, Del Monte is unable to satisfy the second element of a tortuous interference claim. In other words, Del Monte cannot show that Chiquita

---

[12] Like Del Monte, Chiquita is a global producer and distributor of fruits, including bananas.

29

knew the IT Operations contract existed and contained the provisions Chiquita allegedly induced Kinnavy to breach.

Del Monte and Chiquita exchanged letters in the months leading up to this lawsuit. The only contractual obligation mentioned in the letter is Kinnavy's Non-Compete agreement. For example, a June 2007 letter from Chiquita's Global Employee Relations Manager (Michael Benn) to Del Monte's lawyer (Jeffrey Bailey) states in part:

> While Ms. Kinnavy made us aware of Del Monte's Policy of Trade Secret and Non-Competition, she assured us Del Monte would not object to her employment by Chiquita as long as she did not solicit or otherwise interfere with Del Monte's business.

(Am. Compl Ex. F) The letter only mentions the Non-Compete agreement. A follow-up letter from Del Monte's counsel to Chiquita's counsel states in part:

> It was a pleasure to speak with you this afternoon regarding Kim Kinnavy's employment with Chiquita Brands International, Inc. As you are aware, Del Monte Fresh Produce, N.A., Inc., entered into a valid and binding Trade Secret and Non-Competition Agreement ("The Agreement") during her employment restricting her, among other things, from accepting employment with a competitor.

(Am. Comp. Ex. G) Again, there is no mention of any contract other than the Non-Compete agreement.

To rebut Chiquita's motion for summary judgment, Del Monte relies on the deposition testimony of Kinnavy and Theresa Rockhold, a human resources manager at Chiquita. According to Del Monte, Kinnavy e-mailed Rockhold regarding her contractual obligations with Del Monte, and one of those e-mails may have contained the IT Operations contract. Del Monte's reliance on Rockhold's deposition testimony is misplaced.

Rockhold testified as follows:

Q: And so what you asked Kim was if she was subject to any contractual obligations?

A. Absolutely

Q. So was it your purpose in inquiring of her to find out if she had any contractual obligations to Del Mote of any kind?

A. That's Correct …

Q. What was her response?

A. Yes, I have a non-compete with Del Monte. She also stated she didn't think it was applicable.

(Rockhold Dep. at 18-19) Rockhold makes no mention of any contracts other than the

Non-Compete. Rockhold's deposition continued:

Q: Did you ask her, do you have any other agreements with Del Monte, do you have a confidentiality clause, do you have any other contractual agreements with Del Monte?

A: I asked her that in our first conversation.

Q: And she said no?

A: **She said no.**

(Rockhold Dep. at 34)(emphasis added). Rockhold and Chiquita were only concerned

with, and aware of, the non-compete agreement. This was the only agreement referenced

in the letters between Chiquita and Del Monte, and this is the only agreement Kinnanvy

told Chiquita she had with Del Monte. Finally, Del Monte claims Kinnavy may have

sent Rockhold an e-mail with multiple attachments, therefore, a jury might find that one

of those attachments was the IT Operations contract. First, Kinnavy testified she sent

Chiquita only one e-mail regarding her contractual agreement with Del Monte. (Kinnavy

Dep. at 100) Rockhold's deposition testimony supports this claim:

Q: How many e-mails did you receive from Miss Kinnavy which related in any way to Miss Kinnavy's contractual obligations to Del Monte?

A: One.

Q: Was anything attached to the e-mail you have just told us about that you requested?

31

A:     The non-compete

Rockhold testified the single e-mail she received from Kinnavy only contained the non-compete agreement. There is no support in the record for Del Monte's claims that Chiquita was aware of the IT Operations contract. To defeat summary judgment, Del Monte must do more than simply say the jury might disagree with Chiquita. Del Monte needed to put forth actual evidence that could support a finding in its favor; Del Monte has not done so. The Court grants Chiquita's motion for summary judgment as to Count I. *See, e.g., Feldman v. Allegheny International, Inc.*, 850 F.2d 1217, 1224 (7th Cir. 1988) (affirming directed verdict for defendant on tortious interference claim where defendant knew of contract but did not know of exclusivity provision it allegedly violated); *Francorp, Inc. v. Siebert*, No. 00-C1248, 2000 U.S. Dist. LEXIS 17084, *14 (N.D. Ill. Nov. 24, 2000)(finding defendant did not tortuously interfere with an employment contract because: "The record establishes that Siebert had no knowledge of the purported departure date agreement.").

J.     *Del Monte's Intentional Misrepresentation Claim is Deficient*

Del Monte alleges Chiquita made false representations to Del Monte regarding Kinnavy's employment. Del Monte bases its intentional misrepresentation claim on two letters from Michael Benn, Chiquita's Global Employee Relations Manager. Chiquita's letters to Del Monte state in part:

> First, let me assure that Kinnavy's job responsibilities at Chiquita will not require her to have contact with any of Del Monte's customers. Further, Ms. Kinnavy has represented to us that she does not possess any confidential and proprietary information of Del Monte ...

> While Ms. Kinnavy made us aware of Del Monte's Policy of Trade Secret and Non-Competition ("The Policy"), she assured us that Del Monte would not object to her employment by Chiquita as long as she did not solicit or otherwise interfere

32

> with Del Monte's business ... It is a condition of Ms. Kinnavy's employment with
> Chiquita that she refrain from doing so.

(Del Monte Resp. Br. to Chiquita's mot. for Sum. J. Ex. B)

> Chiquita takes contractual obligations, including employee non-competition
> obligations very seriously ... Chiquita has expressly instructed Ms. Kinnavy not
> to disclose or utilize any confidential and/or proprietary information belonging to
> Del Monte.

(Del Monte Resp. Br. Ex. C). Del Monte claims it relied on Chiquita's representations

that Kinnavy would not solicit Del Monte's customers, and these representations were

ultimately proven false.

To prevail on a claim of intentional, (*i.e.*, fraudulent) misrepresentation, a plaintiff

must establish: "(1) a false statement of material fact; (2) the defendant's knowledge or

belief that the statement was false; (3) the defendant's intent that the statement induce the

plaintiff to act; (4) *the plaintiff's justifiable reliance upon the truth of the statement*; and

(5) damages resulting from reliance on the statement." *Bauer v. Giannis*, 359 Ill. App. 3d

897, 834 N.E. 2d 952, 957 (Ill. Ct. App. 2005). Chiquita does not dispute that it told Del

Monte that Kinnavy would refrain from undermining Del Monte's customer

relationships. Chiquita, however, claims Del Monte cannot show that Del Monte relied

on these statements to its detriment. In response, Del Monte provided the affidavit of

Emmanuel Lazopoulos, a senior Vice President of Del Monte Fresh Produce, N.A.,

which states:

> I expected Chiquita and Mr. Benn to accurately respond to Mr. Bailey's June 5
> and July 17, 2007, letters, relied on these misrepresentations, and assumed that his
> representations were truthful and accurate.
>
> In reliance upon on Mr. Benn's and Chiquita's statements Del Monte refrained
> from filing a lawsuit against Chiquita ...

> In further reliance, Del Monte refrained from taking additional marketing steps to focus and reinforce Del Monte's market and sales positions with ... Del Monte customers ...

(Lazopoulos Aff. ¶¶ 4-5) Thus, Del Monte claims it relied on Chiquita's statements in two ways: (1) refraining from taking legal action; and (2) refraining from taking steps to shore up its customer relationships.

As to Del Monte's argument that it refrained from legal action because of Chiquita's statements, the Court notes that Del Monte sued Kinnavy five business days after Chiquita's second letter. Moreover, the Court is troubled by Del Monte's reliance on Lazopoulos' affidavit. Frankly, it appears Lazopoulos had no personal knowledge of whether Del Monte refrained from pursuing legal action due to Chiquita's letters. Lazopoulos deposition testimony is as follows:

> Q: I would like to ask you first, who made the decision to file the litigation in federal court, naming Chiquita as a defendant?
> A: I – I don't know
>
> Q: Did you participate in that decision in any way?
> A: No.
>
> Q: Did you have any input, as to the timing of that decision, in any way?
> A: No.
>
> Q: Did you participate in the decision to file litigation in the Illinois State Court against Kim Kinnavy?
> A: No.

(Lazopoulos Dep. 45-46). Lazopoulos asserts in his affidavit he has "personal knowledge" of Del Monte's legal decisions. In light of his deposition testimony, however, Del Monte's arguments based on Lazopoulos' affidavit seem disingenuous.

Del Monte's engagement letter with Jon Holleb—the computer expert who examined Kinnavy's hard drive—also undercuts Del Monte's reliance argument. The letter states:

> Upon the signing of this Agreement, BKD will engage us to complete the acquisition, analysis and reporting regarding the ***Del Monte versus Kinnavy and the Chiquita Brand*** matter …

(Chiquita Reply Br. Ex. A) (emphasis added). The engagement letter is dated June 30, 2007. Thus, Del Monte had Chiquita in its litigation crosshairs and was gearing up for a lawsuit by *at least* June 30, 2007. Michael Benn's second letter—the same letter Del Monte claims it relied on when refraining from legal action—was dated July 20, 2007, three weeks *after* the engagement letter. The factual record does not support Del Monte's claim that it relied on letters from Chiquita's counsel.

Finally, Del Monte claims—through Lazopolous' affidavit—that it "refrained from taking additional marketing steps" because of Chiquita's assurances. (Lazopoulos Aff. ¶ 5). Once again, the Court is highly suspicious. First, the idea that Del Monte would allow its marketing strategy to be guided by the assurances of its ***chief competitor*** seems preposterous.[13] Indeed, the record shows Del Monte did not rest on its laurels because of Chiquita's promises. During his deposition, Lazopoulos testified Del Monte took extra steps to shore up customer relations once he learned of Kinnavy's defection:

Q: Exactly what did you do?
A: I instructed our Regional Vice-President to talk to all of our customers to make sure that our relationship with them is strong and just, and that – to visit them, or to converse with them to shore up our – our relationship.

Q: Did you not do that when she left your employment to begin with?
A: We—we did that when she left our employment …

---

[13] The Court has its doubts about whether relying on assurances from a business rival is "*justifiable reliance*" in the context of a misrepresentation claim. The parties, however, have not briefed this argument, and the Court, need not address it in order to decide the issue

(Lazopoulos Dep. at 79-80). Del Monte and Chiquita are fierce rivals for banana supremacy. Faced with an aggressive competitor, Del Monte did what any successful business would do, it protected its turf. Del Monte did not refrain from shoring up its customer relations because of Chiquita's letters. Del Monte cannot establish the element of reliance, and accordingly, the Court grants Chiquita's motion for summary judgment as to count II. *See, e.g., Athey Products Corp. v. Harris Bank Roselle,* 89 F.3d 430, 434 (manufacturer did not rely on distributor's alleged misrepresentation of intent to pay for equipment where manufacturer held on to certificates of origin in order to eliminate risk of non-payment: "Athey's claim of reasonable reliance is substantially undermined by its own conduct ..."); *Bachman v. Bear, Stearns & Co,* 57 F. Supp. 2d 556, 562 (N.D. Ill. 1999)(finding shareholder did not rely on firm's alleged misrepresentation where "he did not sell his shares in reliance on Bear Stearns numbers, nor did he abandon any plans to litigate his claims ...").

## IV. Conclusion

In sum, the claims against Kinnavy that survived summary judgment are Count V– Breach of the confidentiality provisions of the IT Operations Contract; Count IX – Conversion of Del Monte's files and property; Count X – Breach of Fiduciary Duty. There are no remaining claims against Chiquita.


IT IS SO ORDERED.

3/19/09
Dated

Wm. J. Hibbler
The Honorable William J. Hibbler
United States District Court